**BERNS & KOPPSTEIN, INC., Plaintiff,**

v.

**ORION INSURANCE CO., Ltd. and Kenneth Walter Stone, Defendants.**

United States District Court
S. D. New York.

Jan. 23, 1959.

710

Katz, Wittenberg & Katz, New York City, for plaintiff, Frank G. Wittenberg, New York City, of counsel.

Mendes & Mount, New York City, for defendants, Walter B. Hall, and John J. Sullivan, New York City, of counsel.

HERLANDS, District Judge.

This is an action upon eight so-called Lloyd's valued marine cargo insurance policies. The policies, in the total face amount of $269,517, covered cargoes of "handpicked, selected" Indian peanuts amounting to 1,753,267 pounds, imported from India to the United States in 1955 on four steamers.

Plaintiff, the firm that imported the peanuts, is the insured. The defendants represent certain members of two insurance syndicates[1] known as Underwriters at Lloyds and The Institute of London Underwriters, who issued the policies through the Corporation of Lloyds.

In 1955, the domestic peanut crop having failed, the United States Government permitted the importation of a certain amount of peanuts from India. Appropriate custom duties and importation fees were promulgated.

The policies herein contain the traditional "sue and labor" clause, the usual "all-risk" clause, and a special "full rejection" clause.

Upon being landed at the Port of New York, it was discovered by the inspectors of the United States Food and Drug Administration that the cargoes were infested by certain species of dead and live beetles and moths. Pursuant to the applicable statutory provisions (21 U.S.C.A. § 381), the Food and Drug inspectors analyzed samples of the cargoes; found that they were "adulterated" i. e., insect-infested; and ordered the peanuts detained. The defendants' agents and expert confirmed the findings of the Food and Drug Administration. The defendants obtained permission to bring the peanuts into compliance with the Federal Food, Drug and Cosmetic Act by reconditioning them.

In the course of the reconditioning operation, all peanuts were reconditioned by fumigation, blowing, brushing, sifting and re-bagging the nuts. Upon completion of the reconditioning operation, the Food and Drug Administration released the greater part of the goods for importation and distribution in the United States. The balance was destroyed under the supervision of the United States Customs authorities.

1,644,926 pounds were released. 108,-341.25 pounds were lost or destroyed. Through the reconditioning process, the handpicked, selected peanuts were mutilated; and they lost their characteristics. They showed an abundance of split, broken and damaged kernels. Defendants' agents acknowledged the deterioration.

1. Four Lloyd's policies were each subscribed by thirteen syndicates of Underwriters at Lloyd's; and their subscriptions (several and not joint) covered 90% of the insured values. Four policies of The Institute of London Underwriters were subscribed by the Orion Insurance Company, Ltd. only, covering 10% of the insured values.

Defendants paid all costs of the reconditioning operation and paid for the greater part of the lost peanuts. Defendants paid a total of $105,827.62.

In the present lawsuit, plaintiff seeks to recover $21,354.52 with interest thereon since September 15, 1955, together with the costs and disbursements of this action.

The claim for $21,354.52 consists of two items: an item of $19,345.63 for depreciated value of the peanuts, for which the plaintiff has not been indemnified; and $2,008.89 for additional shortages or lost peanuts, amounting to 12,937.25 pounds.

The complaint alleges that jurisdiction of the court is founded upon diversity of citizenship and requisite amount. Paragraph "8" of the complaint alleges: "Plaintiff complied with all warranties stipulated in the insurance certificates and performed all conditions to be performed on its part."

The original answer of the defendants contained certain admissions, certain denials and separate and distinct defenses. Among the admissions contained in the original answer, paragraph "First," was an admission as to paragraph "8" of the complaint, i. e., the defendants admittted that the plaintiff complied with all warranties stipulated in the insurance certificates and performed all conditions to be performed on its part. Upon the trial, the defendants moved to amend the answer by adding an additional separa and complete defense, now represented by paragraphs "Twenty-Fourth" and "Twenty-Fifth" of the amended answer. The defendants' motion to amend was granted. Apparently through a typographical error, paragraph "First" of the amended answer still contains an admission with respect to paragraph "8" of the complaint. It is clear that the purpose of the amendment was to withdraw that admission and to substitute a separate and complete defense which now alleges that, contrary to the warranties and conditions precedent imposed on the plaintiff, no surveys were made immediately prior to the various shipments from

India, and that surveys and reports were not made by F. S. Hardcastle & Company, the Indian firm whose survey and certifications were permissibly granted in the certificates of insurance.

Each of the insurance policies involved herein contained a provision certifying "that Lloyds' agent at the port of" New York "has been authorized to adjust and settle on behalf of the Underwriters, and to purchase on behalf of the Corporation of Lloyd's in accordance with the Standing Regulations for the Settlement of Claims Abroad, any claim which may arise on this Policy." A similar provision is contained on the face of each certificate of insurance.

Each policy, as already noted, contains the traditional "sue and labor" clause and clauses generally called "all-risk". In addition, each of the policies and certificates contained what are identified as "Clause 504" and "Clause 505", and which constitute "full rejection" insurance with "additional warranties and exclusions".

Clause 504 reads as follows:

"*Rejection Insurance—Additional Warranties And Exclusions (rejection insurance full)*. In the event of rejection, i. e., rejection and/or condemnation at port of entry by the United States Government or Departments thereof including U. S. Food & Drug Administration, for any reason whatsoever, the settling Agents to advance the insured amount until such time as it is possible to dispose of the rejected interest and obtain salvage for the underwriters."

Clause 504 is annexed to each of the policies as a rider.

Clause 505, likewise annexed to each of the policies as a rider, reads as follows:

" '*Rejection*' *Insurance—Additional Warranties And Exclusions.*

"A. Warranted survey immediately prior to shipment by Lloyd's Agents or by the Agents of the Institute of London Underwriters and a separate certificate of sound

condition in respect of each vessel, each account, be obtained. Fees in this respect payable by the Assured.

"B. Warranted direct shipments, or held covered at a premium to be arranged.

"C. Warranted that packing and labeling conforms with the regulations in force at time of despatch in the countries to which the goods are destined.

"D. Warranted that any regulations made by the Government or Authorities in country of shipment containing the interest insured, including regulations as to fumigation or any other similar process if applicable, are complied with.

"E. It is warranted that in the event of the interest insured being rejected or not being passed within normal time on arrival at U. S., Messrs. Toplis & Harding, Wagner & Glidden, Inc., of New York are to be notified *immediately*, and any requirements or instructions they may issue are to be complied with. Fees in this respect payable by Underwriters, but only in event of claim for rejection hereunder.

"F. This insurance does not cover claims for Loss of Market, nor claims based on rejection by reason of misdescription of the goods hereby insured or from any error or omission in the contract of sale or other documents."

The rejection insurance provisions, as set forth in a typical certificate of insurance, provide, among other things: "Survey to comply with Warranty (A) in attached clause may be by F. S. Hardcastle & Co., Bombay."

Each certificate of insurance contains the following typewritten notation:

"Including Full Rejection as per clause and subject to warranties and exclusions as per clause attached."

Lloyds' agent in New York is the firm of Toplis & Harding, Wagner & Glidden, Inc. (referred to hereafter as Toplis & Harding). They are also the settling agents referred to in the notations on the certificates of insurance and policies already referred to.

The decisive question in this case will be spotlighted by first disposing of miscellaneous contentions advanced by the parties.

The defendants contend, with respect to the Hardcastle & Co. surveys and survey reports, that the plaintiff has failed to comply with warranties and conditions in that the surveys were not made by Hardcastle & Company; secondly, that the survey reports were not in fact made by Hardcastle & Co.; and, thirdly, that the plaintiff failed to show compliance with the provisions of Warranty E which required a survey "immediately" prior to shipment.

With respect to the defendants' contentions concerning the surveys and survey reports by Hardcastle & Co., the Court has already ruled during the course of this trial that the surveys and survey reports submitted herein represented full and complete compliance with the warranty. The Court reiterates that conclusion for the same reasons that are already set forth in the trial minutes.

Hardcastle & Co., a company of good repute, apparently operated its business by having its surveys and other related work done by other firms as subcontractors. This method of operation has been going on for some time. There is no suggestion of bad faith, collusion or fraud on the part of anybody connected with this litigation. The survey reports were submitted by Hardcastle & Co. and certified to by them. They are not now subject to impeachment or collateral attack, for reasons noted by the Court in the record.

With respect to the warranty that the goods were "surveyed immediately prior to shipment", the Court rules that that warranty has been complied with.

The dates involved with respect to each of the shipments vary from several days to about two weeks. These dates appear in the various Madras and Bombay survey reports. In the "statements

of claims" prepared by the defendants' agents, it is stated: "All warranties were complied with." Moreover, the Court is of the view that the word "immediately" is not to be construed as "forthwith," for to do so would be unrealistic and would overlook the actual operating conditions under which goods are surveyed and shipped. Although warranties in marine insurance are to be strictly construed, the word "immediately" must be given a reasonable interpretation.

■ The Court will now consider the contention advanced by the plaintiff that its claim against the defendants were settled and compromised by representatives of Toplis & Harding. Plaintiff contends that the purported agreement of settlement can be inferred from certain remarks made by Capt. J. S. Parry (a surveyor for Toplis & Harding) and R. V. Corsgreen (an assistant vice-president of that organization). Capt. Parry's remarks were made in August, 1955, while he and Max Berns (the plaintiff-corporation's president) were negotiating with Curtiss Candy Co., one of the plaintiff's vendees, to arrive at an allowance which would make the peanuts in their deteriorated state acceptable to Curtiss Candy Co. R. V. Corsgreen's remarks occurred on or about August 15, 1955, while he and the plaintiff were negotiating with Roy E. Parrish (executive vice-president of Georgia Peanut Co., another of plaintiff's vendees) to arrive at an allowance to induce Georgia Peanut Co. to accept deteriorated peanuts.

Reference has already been made to the provisions in the insurance policies and certificates of insurance that expressly empower Lloyd's Agent in New York to adjust and settle on behalf of the underwriters any claim which may arise under the certificates and policies. There is no dispute about the fact that Toplis & Harding are Lloyds' settling agent in New York.

There was also introduced into evidence provisions from Lloyd's "Special Instructions to Lloyd's Agents relating to Settlement of Claims Abroad", issued in London in 1933 and apparently in force and effect in 1955. These instructions implement the authorization which appeared on the face of the policies and certificates. In these "Special Instructions" there are references to "surveyors", "survey reports", "applications for surveys", as well as "agreements of claim".

According to the evidence adduced before the Court, neither Captain Parry nor Mr. Corsgreen read or knew the terms of the policies, nor discussed any phase of the terms of the policies or defendants' liability thereunder with the plaintiff or its representatives.

The printed form of the survey reports prepared by Toplis & Harding (Exhibits 58 to 62) clearly and explicitly stated in two different places that they did not prejudice the underwriters (the defendants) nor affect the terms of the insurance policies. The printed form of survey report states: "This certificate is issued for use in connection with the claim against the parties responsible, but does not imply that the loss is recoverable from underwriters. This must depend upon the terms of the policy of insurance."

Item 21 on the same form reads: "Certified correct and approved, and issued without prejudice and subject to the terms, conditions and amount of the policy of insurance."

The letterhead of Toplis & Harding contained *inter alia* the title "Surveyors And Adjusters." The letter of Toplis & Harding (signed by R. V. Corsgreen) dated August 10, 1955 (Exhibit 69) explicitly stated: "The foregoing is written entirely in our capacity as Surveyors and is not to be construed as waiving of any of Underwriter's rights under any policy or policies of insurance which may apply."

The testimony of Captain Parry, Theodore Holm (Vice-President of Toplis & Harding and director of Lloyd's Agency in New York) and Ralph V. Corsgreen—all of whom were called as witnesses by the plaintiff—established

(1) that neither Captain Parry nor Mr. Corsgreen had actual (express or implied) authority to settle and compromise any of plaintiff's claims against the defendants; (2) that neither Captain Parry nor Mr. Corsgreen was held out by the defendants as having any such authority nor did Captain Parry or Mr. Corsgreen hold himself out as having any such authority; and (3) that they functioned as surveyors and not as adjusters of plaintiff's claims against the defendants.

The other evidence adduced in behalf of the plaintiff—through the deposition of Roy E. Parrish, the trial testimony of A. B. Bentley (plaintiff's insurance broker), the trial testimony of Max Berns and numerous exhibits—fails to establish any of plaintiff's contentions that Captain Parry or Mr. Corsgreen had actual authority (express or implied) or authority "by estoppel" to negotiate settlements of plaintiff's claims against defendants or that they did negotiate such settlements or that plaintiff was misled into thinking that such settlements had been negotiated by them.

Under the respective dates of July 1, 1955, July 14, 1955, and July 21, 1955, Bentley wrote to Toplis & Harding, Exhibits I and H (attention of Captain Parry) and Exhibit K ("let's have the settlement papers in this matter as soon as possible").

Exhibits CC, DD, EE and FF (dated respectively October 3, 1955, October 12, 1955, July 28, 1955, and August 11, 1955) were sent by Bentley to Toplis & Harding to the attention of Mr. Jones.

Exhibit P is a letter of Bentley (dated August 29, 1955) to Toplis & Harding, stating in part: "looking forward to earliest settlement of this claim." Exhibits A, C and E (dated respectively September 1, 1955, September 23, 1955, and September 1, 1955) are forms of "Settlement of Claims Abroad."

Mr. Bentley testified that W. H. Jones was the first assistant to Mr. Holm, the director of Lloyd's agent in New York. Mr. Bentley had two conferences with Mr. Jones about settling the plaintiff's claims against the defendants. On cross-examination, Mr. Bentley testified as follows:

"Q. Didn't you know that you would have to discuss with Mr. Jones any sums of money you wanted to receive by settlement out of these claims?

"A. Yes, I did."

On redirect examination, Mr. Bentley testified that, in the latter part of the negotiations in connection with these claims, Captain Parry told him, in substance, that he (Captain Parry) could not help him, and "If you want to discuss the matter, you must go to my superior, Mr. Jones, and discuss it with Mr. Jones."

A close analysis of Mr. Bentley's testimony in the light of related exhibits and the other evidence in the case leads to the findings and conclusions (1) that Mr. Bentley and his client, the plaintiff, did not rely on such allowances as were made by Captain Parry and Mr. Corsgreen as settlements of plaintiff's claims against the defendants but only as adjustments of the claims of plaintiff's customers vis-à-vis the plaintiff based on depreciated value of the peanuts; (2) that neither Mr. Bentley nor the plaintiff relied on any alleged authority (actual or colorable) of Captain Parry or Mr. Corsgreen to settle plaintiff's claims against the defendants; and (3) that if, *arguendo*, Mr. Bentley or the plaintiff did rely upon any such alleged authority, such reliance was not reasonable.

The plaintiff has failed to sustain its burden of proof of establishing by the weight of credible evidence either (1) that Captain Parry or Mr. Corsgreen had actual (express or implied) authority to settle plaintiff's claims against the defendants; or (2) that the defendants are estopped to deny the alleged authority of Captain Parry or Mr. Corsgreen to settle plaintiff's claims against the defendants.

The evidence clearly shows that Captain Parry and Mr. Corsgreen had no

actual authority (express or implied) to make such settlements.

■ In order to prove "agency by estoppel," it is necessary to establish all of the following elements: (a) That intentional or negligent acts of commission or omission by the defendants created the appearance of authority in the alleged agents, Captain Parry or Mr. Corsgreen; (b) That the plaintiff acted in good faith and with reasonable prudence in relying upon such appearance of authority; and (c) That the plaintiff changed its position to its detriment in reliance upon such appearance of authority. McNutt Oil & Refining Co. v. Mimbres Valley Bank, 10 Cir., 1949, 174 F.2d 311; Hall v. Union Indemnity Co., 8 Cir., 1932, 61 F.2d 85, certiorari denied 1932, 287 U.S. 663, 53 S.Ct. 222, 77 L.Ed. 572; Fairmont Aluminum Co. v. Stuart Eng. & Mfg. Co., D.C.D.N.J.1957, 150 F.Supp. 507; Gilmore v. Royal Indemnity Company, 5 Cir., 1956, 240 F. 2d 101; Hollywood Holding & Development Corp. v. Oswald, 1931, 119 Cal.App. 21, 5 P.2d 963.

Where, as is found in the present case, these elements are not established, there can be no agency by estoppel. Berryhill v. Ellett, 10 Cir., 1933, 64 F.2d 253; Standard Accident Insurance Company v. Simpson, 4 Cir., 1933, 64 F.2d 583, Cf. Gumpert v. Bon Ami Company, 2 Cir., 1958, 251 F.2d 735.

The Court is convinced that Captain Parry and Mr. Corsgreen did—as defendants readily concede—undertake to confer with the plaintiff and plaintiff's customers and to negotiate adjustments with the plaintiff's customers as to the allowances to be granted to them by plaintiff in view of the deteriorated condition of the peanuts. This accounts for oral and written references to "allowances", "claims" and "settlements" in the conferences and correspondence with which Captain Parry and Mr. Corsgreen were connected. There is some degree of ambiguity in such references when viewed now, after the event and in the light of plaintiff's arguments as a litigant. But the ambiguity is quickly dissipated on analysis and upon consideration of the full context of the transactions, negotiations and statements made by the participants.

Quite understandably, the defendants were interested in minimizing the amount of damages suffered by plaintiff's goods. The measure of that damage would be determined by the reasonable allowances to be granted by plaintiff to its customers in order to induce them to accept the damaged goods at a discount from the contract price. The survey reports and Captain Parry's and Mr. Corsgreen's participation in the conferences with plaintiff's customers on the subject of allowances to the customers related solely and exclusively to the subject of "settling" the adjustments between plaintiff and plaintiff's customers and did not relate to a settlement of plaintiff's claims against the defendants.

■■ Consideration will now be given to the plaintiff's contentions with regard to "sales in bond." The plaintiff seeks to establish that the transactions between the plaintiff and its customers were "equal to" sales in bond in an effort to bring this case within an exception to the usual formula of adjustment in particular average.[2]

In the ordinary situation where adjustment in particular average is made between insurer and insured under a valued marine cargo policy, the indemnity payable to the insured is computed by an equation expressing proportions as follows: the numerator of the first fraction is the gross value of sound goods at the market of destination and the denominator of that fraction is the amount of the actual loss in value or deterioration of the damaged goods. This fraction equals another fraction the numerator of which is the insured value of the goods as per policy and the denominator of which is "X", representing the amount

---

2. McArthur, Marine Insurance (2d ed. 1890) 246–258; Arnould, Marine Insurance (13th ed. 1950) 931–932.

recoverable by the insured. Gross value of sound goods means, ordinarily, the wholesale price with freight, landing charges, and duty paid beforehand. The loss in value is, ordinarily, the difference between the gross sound value and the damaged value at the place of arrival.

In order to increase "X", the amount recoverable by plaintiff, plaintiff claims that the numerator of the first fraction should be 15.094 cents per pound, the value of sound goods—not 25.124 cents per pound at the market of destination, Chicago—but at New York where the goods were landed and *before* being passed by Customs. If that were so, the New York value would be a total of 10.-03 cents per pound less than the sales price F.O.B. Chicago (25.124 cents per pound) because it would be 25.124 cents per pound less Customs duty and importation fee amounting to 9 cents per pound and 1.03 cents for freight from New York to Chicago. If 15.094 cents per pound were used instead of 25.124 cents per pound as the value of the sound goods, plaintiff would recover more from defendants, assuming that the matter were adjusted in particular average.

To support its position, plaintiff argues (1) that an exception to the ordinary application of adjustment in particular average relates to goods sold in bond, in which case the value of the goods *before* payment of Customs duty and importation fee is used as the numerator of the first fraction in the equation; and (2) that the sales by plaintiff to its customers herein while not technically sales in bond should be treated as "equal to" sales in bond.

The fallacy in plaintiff's argument is its minor premise. The Court will assume *arguendo* that the exception referred to by plaintiff is recognized in the law of marine insurance with respect to goods "customarily sold in bond." McArthur, The Contract of Marine Insurance (2nd Ed., 1890) 252, 253; Arnould, Marine Insurance (13th Ed., 1950) 1017; British Marine Insurance Act of 1906, Section 71, subdivision 4, which may be applicable to Federal admiralty cases. See Aetna Insurance Co. v. Houston Oil & Transport Co., 5 Cir., 1931, 49 F.2d 121, 124, certiorari denied 284 U.S. 628, 52 S.Ct. 12, 76 L.Ed. 535.

But, in point of fact and law, plaintiff's sales to its customers were not "sold in bond." The October 16, 1958, deposition of Ralph J. McGinnis, read into the trial record by plaintiff, showed that in 1955 it was customary in trading Indian peanuts in the United States (1) in the case of a "C.I.F. New York" contract to provide that Customs duty and importation fee were for the buyer's account; and (2) in the case of an "F.O.B. Chicago" contract to provide that any rebate or increase of customs duty and importation fee was for the buyer's account.

There were ten contracts between the plaintiff and its vendees (Exhibits 18 through 27). Four of these contracts (Exhibits 18, 22, 24 and 25) were F.O.B. Chicago and contained a provision reading "Duty for seller's account. Any rebate or increase of import duty or tax for buyer's account." Invoice prices ranged from 24¾ cents per pound to 26¼ cents per pound. Four contracts (Exhibits 20, 21, 23 and 26) were F.O.B. Chicago and contained a provision the same as the one just quoted, except that it stated "duty and tax for seller's account." Invoice prices ranged from 24¾ cents per pound to 25½ cents per pound. One contract (Exhibit 19) was C.I.F. New York and contained a provision: "Buyer to arrange for customs clearance * * * immediately on discharge of merchandise from ocean vessel," and, "Import duty and tax for buyer's account." The invoice price was $15.60 per hundred pounds. One contract (Exhibit 27) was ex dock New York and contained a provision: "Duty and tax for buyer's account." The invoice price was 14⅞ cents per pound.

These transactions between plaintiff and its customers were not sales in bond nor may they be treated "as if" they were sales in bond for purposes of adjustment in particular average, for the following reasons:

(a) The alleged practice was short-lived and limited to 1955. Such a transitory condition in the peanut business does not constitute a mercantile custom[3] for purposes of marine insurance adjustment in particular average or for purposes of creating an exception to the usual formula of such adjustment.

(b) The situation in 1955 was a special emergency caused by a United States crop failure.

(c) In fact, the sales were not in the traditional or conventional form of sales in bond.

(d) In eight of the contracts, duty and tax were expressly for the seller's account. The buyer was interested only in adjustments.

(e) In these eight contracts the seller's capital was tied up in the customs duty and tax, and the overall price included duty and tax.

(f) The provisions for adjusting fluctuations in duty and tax (like similar provisions as to rates of exchange) are widely used in the importing business and in international trading generally. Such transactions are not to be treated as sales in bond, which have a special and technical connotation.

The decisive issue in this case concerns the meaning, scope and coverage of the "full rejection" insurance, the provisions of which have already been quoted.

It is the Court's finding and conclusion that, for the reasons detailed below, the plaintiff is entitled to judgment herein for the amount sued for under the "full rejection" insurance provisions.

The rejection insurance covers *inter alia* the event or contingency of rejection "at port of entry by the United States Government or Departments thereof including U. S. Pure Food and Drug Administration, *for any reason whatsoever*." (Emphasis supplied.)

The policies and certificates further provide that, in the event of "rejection", the settling agents (meaning Toplis & Harding) are to advance the insured amount until such time as it was possible to dispose of the rejected interest and obtain salvage for the underwriters.

The Court does not find that this case involves salvage because the goods were in fact ultimately admitted and were not rejected; but the provision that, in the event of rejection, salvage was to be obtained for the underwriters is not without significance in relation to the problem of contract interpretation which lies at the heart of the problem before the Court.

The certificates and policies show that the rejection insurance and related additional warranties and exclusions were special provisions added to the standard valued marine cargo policy. These provisions were inserted in typewriting on the printed form and also by means of special riders that were annexed to the printed standard form.

The substantial premium paid by the plaintiff for the "full rejection" insurance was to insure the plaintiff against government rejection "for any reason whatsoever." The rejection insurance was insurance against government action, i. e., rejection.

But the rejection insurance provisions also contain a provision relating to detention of goods, for Warranty "E" provides: "It is warranted that in event of the interest insured being rejected or not being passed within normal time on arrival in U. S., Messrs. Toplis & Harding, Wagner & Glidden, Inc., of New

---

**3.** Cf. Holmes-Pollock Letters (1941) I., p. 4, Pollock to Holmes, July 3, 1874:

"As to mercantile custom, see the important late case of Crouch v. Crédit Foncier (L.R. 8 Q.B. 374 [1873], showing that the law merchant can not now be extended by evidence of any modern custom: a curious contrast to the time when the law was still so fluid that the Court could take the evidence of merchants to satisfy itself whether pirates were perils of the sea. On the other hand the customs of particular trades as distinct from mercantile custom in general have of late years had more weight given to them than ever before, e. g. Fleet v. Murton (L.R. 7 Q.B. 126 [1871])."

York are to be notified *immediately,* and any requirements or instructions they may issue are to be complied with. Fees in this respect payable by Underwriters, but only in event of claim for rejection hereunder."

Warranty "E" thus covered two possibilities: rejection *or* "not being passed within normal time on arrival at U. S.", i. e., detention. The insured was required to comply with "any requirements or instructions" issued by Toplis & Harding. Defendants were required by Warranty E to pay "Fees in this respect". The phrase "in this respect" refers to compliance with requirements or instructions issued by Toplis & Harding.

■ The word "fees" is ordinarily synonymous with compensation, charges or payments for services rendered. It is doubtful whether in its literal sense the word "fees" can be extended to mean damages sustained as the result of complying with defendants' instructions or requirements and to be paid or reimbursed by the defendants.

The matter, however, is not entirely free from doubt; and any ambiguity should be resolved against the defendants who prepared the contract and in favor of the plaintiff.

That the clause as a whole is to be interpreted as subjecting the defendants to the obligation to indemnify plaintiff for the direct economic consequences of the defendants' reconditioning the peanuts is indicated by the practical construction placed on the clause by the defendants' own conduct in (1) paying all expenses of the reconditioning; and (2) paying for all peanuts lost in the course of the reconditioning.

As a matter of fairness, the clause should be construed as meaning that the defendants are to bear the direct economic consequences of their efforts to avoid their paying for the threatened and imminent rejection of the peanuts by bringing the peanuts into compliance with the statutory requirements as applied by the United States Food and Drug Administration.

The distribution of the risks of the reconditioning should be allocated equitably unless the parties have otherwise clearly stipulated. There is no clearly contrary stipulation.

In considering the distribution of risks, it is to be noted (1) that the defendants alone stood to benefit by the reconditioning of the peanuts; (2) that the reconditioning was not necessary to preserve or protect the goods from further deterioration or damage, as fumigation alone would have sufficed for that purpose; and (3) that the defendants in their survey reports (Exhibits 63 to 66) admitted that the increase in splits was caused by the reconditioning process.

The testimony of Dr. Michael F. Lauro, considered in the light of the other evidence in the case, establishes that the reconditioning process was undertaken solely for the purpose of getting the goods passed by Customs and thus to avoid rejection; that fumigation alone without the physical manipulation involved in the reconditioning operation would have preserved the peanuts; that the infested peanuts could have been fumigated while in the original burlap bags and that such chemical treatment would have sufficed to preserve the nuts from further deterioration and damage; that fumigation does not cause splits; that infested peanuts more readily split when physically manipulated as by brushing, sifting, turning and shaking; that the insect eggs could be discovered only by microscopic examination whereas the Food and Drug Administration analysis amounted to only a macroscopic examination.

The official records of the Food and Drug Administration (Exhibits U, V, W and X) have been examined by the Court. These records show that the Government released the sound portion of the peanuts when they were "satisfactorily reconditioned." Rejections were destroyed under Customs supervision. There was a certain loss in the cleaning process.

Each of the records of the Food and Drug Administration states that the

"method of examination" was "macroscopic." The Government expressed no concern with microscopic insect eggs.

With respect to the five survey reports (Exhibits 58 to 62), it appears that each of these reports states that the reconditioning was done after the defendants' agents were advised by the Food and Drug representatives who expressed the opinion that the peanuts could be satisfactorily processed "that could permit their being released for distribution in the United States by having the bags fumigated, the nuts blown, brushed, sifted and rebagged."

These survey reports demonstrate that the sole concern of Toplis & Harding was to satisfy the Food and Drug Administration; that the Food and Drug Administration outlined the steps to be taken in the reconditioning; and that what the defendants did was done only to satisfy the Food and Drug Administration.

 The Court has concluded that the "sue and labor" clause neither applies to nor affects the situation under consideration. The special full rejection insurance controls, as expressed in Clauses 504 and 505 annexed to the policies (Exhibits 9 to 16).

Rejection insurance is a special contract, in addition to the standard form of Lloyd's marine cargo policy.

The "sue and labor" clause which appears in the main body of the policy and is connected with the Perils of the Sea clause does not apply to the rejection insurance under the circumstances of this case. Cf. Xenos v. Fox (1868) 3 C. P. 631, affirmed (1869) 4 C.P. 665.

The rejection clause covered a special and specific risk other than and in addition to the standard marine cargo risk and is not to be circumscribed by the standard "sue and labor" clause.

The standard "sue and labor" clause covers a *voluntary* expenditure on the part of the insured to protect the goods against the standard risks covered by the policies.

Pursuant to Warranty "E", the plaintiff had no right voluntarily to "sue and labor". When the peril arose, i. e., on detention, plaintiff was "immediately" under a duty to notify Toplis & Harding and to comply with their instructions and requests.

Voluntary efforts on the part of the plaintiff would have been a breach of Warranty "E" and might well have created a valid defense on the part of the defendants.

 The charges involved in this case are not "in the nature" of sue and labor. "Sue and labor" clauses are a concession by the insurers to encourage the insured's efforts in behalf of the goods. McArthur, supra, 262–271; Arnould, supra, 31–32, See American Merchant Marine Ins. Co. of New York v. Liberty Sand & Gravel Co., 3 Cir., 1922, 282 F. 514, 519–522. Here, the plaintiff could not sue and labor. The plaintiff had to obey.

 Moreover, the full rejection insurance clauses represent special provisions which prevail over the general language where there is any inconsistency or ambiguity. See Mutual Life Ins. Co. of New York v. Hill, 1904, 193 U.S. 551, 557, 24 S.Ct. 538, 48 L.Ed. 788; Bock v. Perkins, 1891, 139 U.S. 628, 634, 11 S. Ct. 677, 35 L.Ed. 314; Kidston and others v. The Empire Marine Insurance Company, Ltd. (1866) 1 C.P. 535, 546.

So far as the plaintiff was concerned, rejection entailed no loss whatsoever. If there had been a rejection, the plaintiff would have received 15.3 cents per pound, the average insured value, whereas it would have lost only 15.094 cents. Thus, what it would have received in the event of rejection would be more than its actual damages and lost profit.

 Reconditioning was *entirely* for the defendants' benefit. It is to be assumed that the parties intended to stipulate for that which is fair and reasonable, having regard to their mutual interest, namely, that the defendants who had the

full benefit of their "requirements and instructions" bore the full risk.

Were there any doubt as to the correctness of this proposition, the ambiguity would have to be resolved in favor of the plaintiff. Trinidad Corporation v. American Steamship Owners Mutual Protection & Indemnity Association, 2 Cir., 1956, 229 F.2d 57, certiorari denied 351 U.S. 966, 76 S.Ct. 1032, 100 L. Ed. 1486; Hartol Products Corp. v. Prudential Ins. Co., 1943, 290 N.Y. 44, 49, 47 N.E.2d 687.

As noted, rejection and detention are on equal footing, for detention is a clear case of goods "not being passed within normal time on arrival at U. S." (Warranty E).

■■■■ The risk insured by the full rejection insurance was not a deterioration of the quality or loss in quantity (as is the case in the "all-risk" clause), but an act of the "United States Government or Departments thereof, including" but not limited to the United States Pure Food and Drug Administration, "for any reason whatsoever" (Clause 504).

The peril insured against by the rejection insurance was not the presence of a putrid substance but the act of the Government. Arbitrary rejection or detention, miscarriage of administrative determination in rejecting or detaining was just as fully covered as justified rejection and detention because Clause 504 refers to "any reason whatsoever". The act of the Government was the "peril", not the condition of the goods. One bug in any bag would have justified rejection under the language of the Food, Drug & Cosmetic Act.

■■■■ Without rejection insurance, the act of the Government as such would not have been the basis of any claim against the defendant-underwriters. It would not have been a peril insured against. Deterioration or quality loss alone would have been the basis of a claim under the "all-risk" clause. Thus, the Court concludes and finds that it was the Federal protective statute alone which set the "chain of causation" in motion. The operation of that statute (among other possibilities of governmental action) was, *under the rejection insurance*, one of the perils insured against, not the bugs. Therefore, when the goods arrived, the fact that they contained insects did not even cause the survey. It was the detention—the Government's act insured against—which caused it.

The defendants argue that all of the damage must be treated as arising from excessive infestation. It is thus the defendants' position that "but for" the bugs there would have been no reconditioning operation and no damage. The Court rejects this contention for the following reasons:

1. Without the Food and Drug Administration's action the goods might have been accepted by the trade. We do not know the actual extent of the infestation nor its consequent influence on the value of the goods. We know that the survey itself and the claim lodged with defendants were not based on "insects" but on "detention", that is, on the act of the Government, the peril insured against. The "but for" causation does not start with the bugs but with the detention.

2. There is no evidence that reconditioning by splitting the nuts was the normal, regular, unavoidable consequence of detention. We know that the process of reconditioning split the nuts. We do not know whether other treatment may have avoided the splits.

3. The nuts were not reconditioned to cure them, but to bring them into compliance with the law and thus to have them passed. The operation was not undertaken for any purpose similar to that of "sue and labor" under the "all-risk" clause, because the quality of the goods was immaterial. What did matter was getting the goods passed by the Government.

In the insurance field, the proximate cause is to be defined as "the efficient predominating" cause. Phillips Insur-

ance (1867) Vol. 2, p. 678; Standard Oil Co. of New Jersey v. United States, 1950, 340 U.S. 54, 58, 71 S.Ct. 135, 95 L.Ed. 68. On all of the evidence presented to the Court, the one cause to which may variously be ascribed the qualities of reality, predominance and efficiency, was the reconditioning operation. It was the proximate cause of the splits. The infestation was the remote cause.

Under the "all-risk" clause applicable in the absence of rejection insurance, the damage to the goods by insect-infestation would have been the only criterion of the underwriters' liability. Such liability would have been the difference between the gross value of the goods in sound condition and the gross value of the goods in infested condition at the time and place of delivery. There is no evidence of the extent of this damage. However, under the rejection insurance which alone is applicable herein, the plaintiff's claim is based on the defendant-underwriters' obligation implied in Warranty "E" to bear the cost and risk of the operation which Toplis & Harding required and instructed the plaintiff to commence by virtue of Warranty "E".

Deterioration by infestation was not covered by the rejection insurance. Deterioration resulting from an effort to avoid rejection was covered by implication in Warranty "E".

It is the position of the defendants that the deterioration of the peanuts represents a partial accidental loss; that this partial accidental loss is to be considered as having been caused by insect-infestation during the voyage; and that this infestation during the voyage constituted a peril of the voyage. Consequently, defendants claim that, because the partial accidental loss was caused by the infestation during the voyage, the settlement or adjustment of that partial loss must be adjusted in particular average.

The Court overrules the defendants' contention in this respect. The damage represented by the deteriorated value of goods does not come within the concept of partial accidental loss sustained as a peril of the sea or within the "all-risk" clause, but comes within the operation of the full rejection insurance.

The depreciated value of the reconditioned peanuts should be borne to the full extent by defendants and not to the extent of three-fifths which defendants paid by adjusting in particular average on the erroneous theory that the results of the reconditioning were integrated with a partial accidental loss under the "all-risk" clause. The additional amount thus required to be paid by defendants for this item is $19,345.63.

The basis for the recovery of the second sued-for item of $2,008.89 is that the conclusiveness of the pre-shipment Hardcastle & Co. surveys and certifications—as between plaintiff and its vendees and as to the quantities shipped—was destroyed by the emptying of the burlap bags in order to have the peanuts reconditioned and by the reconditioning operation itself. But for the acts of such emptying and reconditioning, plaintiff would have been paid by its vendees on the basis of the certificated quantities. The resultant difference is represented by the damage item of $2,008.89.

The Court denies the defendants' motion for judgment dismissing the complaint. The Court grants judgment in favor of the plaintiff for the relief prayed for in the complaint, with interest, together with costs and disbursements of this action.

Judgment shall be entered forthwith by the clerk. Time to appeal starts to run from the entry of the judgment by the clerk. See United States v. F. & M. Schaefer Brewing Co., 1958, 356 U.S. 227, 232–233, 78 S.Ct. 674, 2 L.Ed.2d 721. Without in any way affecting the foregoing, the Court will require a formal judgment to be settled within five days from the date hereof, together with any supplemental or additional findings or conclusions as counsel may deem to be necessary or appropriate.