S. S. SILBERBLATT, INC. and Travelers Indemnity Company, Appellants,

v.

SEABOARD SURETY COMPANY and Carter Electric Company, Appellees.

CARTER ELECTRIC COMPANY, Appellant,

v.

S. S. SILBERBLATT, INC. and Travelers Indemnity Company, Appellees.

Nos. 18843, 18844.

United States Court of Appeals Eighth Circuit.

Oct. 23, 1969.

Bernard A. Reinert, of Kenney, Reinert & Hespen, St. Louis, Mo., for S. S. Silberblatt, Inc. and Travelers Indemnity Co.; Francis L. Kenney, Jr., St. Louis, Mo., and E. C. Curtis, of Farrington & Curtis, Springfield, Mo., with him on the brief and reply brief.

Joseph J. Becker, Clayton, Mo., for Carter Electric Co.; William J. Becker, Clayton, Mo., with him on the brief.

Bernard L. Balkin, Achtenberg, Sandler & Balkin, Kansas City, Mo., for Seaboard Surety Co., F. W. Mueller, St. Louis, Mo., with him on the brief.

Before VAN OOSTERHOUT, Chief Judge, and MEHAFFY and HEANEY, Circuit Judges.

MEHAFFY, Circuit Judge.

This is a Capehart Act case growing out of controversies between S. S. Silberblatt, Inc., the general contractor on an 800-unit military housing project at Fort Leonard Wood, Missouri, Carter Electric Company, Silberblatt's electrical subcontractor, and the latter's alleged surety, Seaboard Surety Company.[1] Travelers Indemnity Company is a party to the suit by reason of its being Silberblatt's surety.

Jurisdiction is established by diversity of citizenship and the requisite amount in controversy as well as 28 U.S.C. § 1352 and the applicable provisions of the Capehart and Miller Acts.[2]

The district court held that the performance bond and the labor and material payment bond which Carter procured from a former attorney-in-fact for Seaboard were invalid because the attorney-in-fact lacked authority to execute them and because Seaboard did not hold him out to Silberblatt as its agent and did not subsequently ratify his actions. The court held also that Silberblatt was not entitled to damages from Carter to which it awarded the electrical subcontract or from Carter's alleged surety, Seaboard, for breach of contract. Carter was likewise denied relief by the district court on its counterclaim for moneys allegedly due from Silberblatt. The court held that Silberblatt and Carter had waived any rights which they had

under the subcontract and, in fact, that no contract existed at the time of the alleged breach but that the parties were merely operating under an employer-employee relationship and were not entitled to recover anything from each other.

The district court made separate findings of fact and conclusions of law in the "Silberblatt-Seaboard Controversy" and the "Silberblatt-Carter Controversy." The court's decision is not reported.

We affirm the judgment of the district court absolving Seaboard of liability on the purported bonds, but reverse and remand the court's judgment as to the Silberblatt-Carter controversy holding that the subcontract was not abandoned by the parties but that it was in existence at the time Carter walked off the job in November, 1962.

This case reaches us upon a voluminous record and with an aggregation of subsidiary and collateral issues, some discussed by the trial court and argued in briefs, all of which we have considered but a number of which we conclude have no bearing upon the crucial and determinative points which form the basis for our conclusions. For example, we are of the opinion that the effective date of the subcontract is of no significant consequence in view of our holding that there are other sufficient grounds on which to base our affirmance of the trial court's finding that Seaboard is not liable under the purported bonds.

On August 3, 1960, the Department of the Army sent Silberblatt a "Letter of Acceptability" stating that Silberblatt's bid, dated May 13, 1960, in the amount of $12,194,200.00 for the construction of the aforementioned 800-unit housing project was the lowest acceptable bid, and outlining the requirements which Silberblatt must meet preparatory to en-

---

1. See 42 U.S.C. § 1594 et seq. and 12 U.S.C. § 1748 et seq.

2. 42 U.S.C. § 1594; 40 U.S.C. § 270a and § 270b; Koppers Co. v. Continental Cas. Co., 337 F.2d 499 (8th Cir. 1964); Continental Cas. Co. v. Allsop Lmbr. Co., 336 F.2d 445 (8th Cir. 1964), cert. denied, 379 U.S. 968, 85 S.Ct. 662, 13 L.Ed.2d 561 (1965).

tering into the formal contract. Following completion of these requirements, the formal contract was executed February 23, 1961. On that date performance and payment bonds were also executed by Silberblatt as principal and Travelers Indemnity Company as surety in compliance with 42 U.S.C. § 1594.

Soon after receipt of the Letter of Acceptability and prior to the signing of the formal contract with the Government, Silberblatt began awarding subcontracts to the approximately twenty or twenty-five subcontractors needed to construct the project. On August 31, 1960, representatives of Silberblatt met with Lester (Les) L. Carter, President of Carter Electric Company, and a subcontract was executed by Mr. Carter to do the electrical work, underground telephone lines, etc. for the sum of $600,000.-00, with certain additional optional items contained in addenda to the contract. Mr. Carter testified that Bruce Silberblatt, son of S. S. Silberblatt and Vice President of the company, signed the subcontract on behalf of Silberblatt at that time but that Carter was not given a copy which was signed by Silberblatt. S. S. Silberblatt testified that delivery of a signed copy to Carter was withheld pending the furnishing of acceptable performance and payment bonds which Silberblatt was authorized to require under the terms of the contract. On March 20, 1961, Silberblatt requested Carter to return his copy of the contract for Silberblatt's signature and it was signed and returned to Carter March 30, 1961. The court held that it was then that the contract was executed by Silberblatt.

On October 31, 1960, Carter forwarded to Silberblatt a duplicate original of the required surety bonds, dated August 31, 1960, which had been executed by Carter as principal and John P. Duncan as attorney-in-fact for Seaboard, as surety. They bore Seaboard's corporate seal impression and a notary's certificate fully executed. Attached to the original of the bonds which Carter retained was a verified copy of Power of Attorney No. 4390, executed on October 21, 1958 by Seaboard to Duncan, but no power of attorney certificate was attached to the copies furnished Silberblatt, the obligee thereunder. It developed that this power of attorney and also a later one issued to Duncan by Seaboard had been revoked, and it is agreed by all parties to this litigation that Duncan had no actual authority to bind Seaboard, the issue being whether Seaboard was estopped to deny his so-called "apparent" agency or authority.

The first that Seaboard heard of the bonds was when it received an inquiry on or about January 5, 1961 as to whether it was Carter's surety on the aforementioned project. It immediately telephoned Silberblatt concerning the status of the job and, thereafter, upon making a check of its records Seaboard discovered that they did not reflect the issuance of any such bonds. Thereupon, two representatives of the company were sent to St. Louis to see Duncan and Carter about the matter. Duncan admitted executing them but stated that he intended to replace them with bonds written by another company after the first of the year. He received $1,500.00 from Carter as a premium, which he never forwarded to Seaboard, and claimed that it was a service fee for the work he had done on the case.

On January 11, 1961, Seaboard wrote to Silberblatt stating that Duncan had no authority to execute the bonds and it did not consider them valid and suggesting that Silberblatt require Carter to provide other suretyship. On January 16, 1961, Silberblatt wrote Carter by certified mail instructing Carter to immediately provide other satisfactory surety.[3]

---

3. "We are in receipt of a letter from Seaboard Surety Company, dated January 11, 1961, in which they state that the bonds issued on their forms are not valid instruments. You are therefore instructed to immediately provide other satisfactory surety. In this connection we are enclosing herewith a copy of Seaboard Surety's letter of January 11, 1961.

Other correspondence ensued but Carter never procured any other bonds, and his attorney indicated that he could not get other bonds for the same amount. This is not surprising since Seaboard states that its premium for the purported bonds executed by Duncan in the amount of $600,000.00 would have been $3,350.00, rather than the $1,500.00 which Duncan collected and kept. Duncan indicated that he was on the verge of obtaining bonds from Glens Falls but this never materialized.

Although Silberblatt requested Carter to obtain bonds from another company, the termination of its contract for failure to do so was apparently never considered. This is expressly reflected in a letter of February 6, 1961 from Silberblatt to Carter's attorney in which it is stated:

"You may rest assured that we are not, and have not at any time, requested that Carter Electric Company withdraw from its contract with us. We are happy to have them with us."

A provision in the subcontract authorized Silberblatt to demand of Carter satisfactory performance and payment bonds at any time prior to or during the progress of the work.[4] Silberblatt did not require Carter to obtain other bonds, however, but instead furnished Carter with an executed copy of the subcontract on March 30, 1961. Seaboard continued to deny liability under the bonds and on February 27, 1961, wrote to the Missouri Superintendent of Insurance detailing Duncan's unauthorized acts.

Early in 1962 Carter began having severe financial difficulties and requested weekly draws on the moneys remaining in the subcontract. On January 24, 1962, Carter discussed with Silberblatt on the telephone an agreement to give Silberblatt one-third of the profit on the job in return for weekly advances, plus payment of such invoices as might be mutually agreed upon. Silberblatt contends that he never agreed to this but told Carter to put it in writing and send it on to him and he would consider it. Carter mailed a letter to Silberblatt on the same date outlining the terms to which he agreed. Carter later repudiated the agreement, stating that he had been advised by his attorney that it was in violation of the Federal Anti-Kickback Act.[5] Carter Electric, however, relied on this so-called "partnership and profit sharing agreement" in its counterclaim against Silberblatt but the court found that during the course of the litigation Carter obviously abandoned its claim that the letter made it a partner of Silberblatt. Silberblatt testified that although he and his company were glad to assist Carter, he did not feel it was necessary for Carter to give the company any share of the profits. Silberblatt stated that the company did make arrangements to make payments to Carter on a weekly basis by way of deposits in the Rolla State Bank. Numerous other financial difficulties plagued Carter, including a levy by the Internal Revenue Service for delinquent withholding taxes, and Silberblatt released to the Government in excess of $17,000.00 so that Carter could continue with its work. Silberblatt repeatedly reaffirmed the subcontract, however, writing Carter on July 23, 1962 that Carter's obligations under

"It is asked that you handle the matter with the greatest expeditiousness, since our excavation is scheduled to go forward within a matter of days."

4. Article XXIII of the subcontract provided:

"The first party [Silberblatt] may at any time prior to or during the progress of the work demand that within ten days of such demand the second party [Carter] deliver to the first party a duly executed surety company performance and payment bond by a company satisfactory to the first party in the amount of this contract and in form satisfactory to the first party and without expense to the first party."

5. See 41 U.S.C. § 51 and United States v. Acme Process Equipment Co., 385 U.S. 138, 142, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966), holding that the Act embraces "cost-plus-a-fixed-fee" or other cost reimbursable government contracts and all "negotiated contracts."

the subcontract had not been altered, and stating in other correspondence that "our written contract of August 31, 1960 is the only agreement that exists." Carter also repeatedly reaffirmed the subcontract in its correspondence with Silberblatt.

Carter notified the electrical workers union on Friday, November 23, 1962, that Carter Electric's employees were not to report to work on Monday, November 26, 1962, and for them not to go back to work until they were so advised by Carter. Thereupon, Silberblatt stopped payment on all moneys going to Carter, seized Carter's equipment and materials on the job site, and on November 27, 1962, gave Carter two days' written notice of the termination of the subcontract as provided in Article XII thereof, and notified Seaboard of Carter's default. Silberblatt thereafter accepted a letter proposal from Magann Electric Corporation for the completion of the electrical subcontract work on the project.

*The Silberblatt-Seaboard Controversy.*

The parties agreed that the separated issue with regard to the Silberblatt-Seaboard controversy was whether the performance bond and the labor and material payment bond which were delivered to Silberblatt by Carter were binding obligations of Seaboard. Silberblatt states in its brief that "the real issues between Silberblatt and Seaboard are (1) whether Seaboard left Duncan clothed with apparent authority to execute and deliver Carter's bonds and (2) whether Silberblatt reasonably and in fact relied to its detriment on the bonds." Trial by jury was waived and the case was submitted to the court with a motion and cross-motion for summary judgment, on an agreed statement of facts, numerous exhibits, and depositions.

The court held that Duncan had no actual authority, either express or implied, to bind Seaboard after May 9, 1960, which was the date of the revocation of his last power of attorney for Seaboard. The court further held that Seaboard did not either ratify or affirm any of Duncan's obviously fraudulent action after it learned what had happened. It found that although Silberblatt received the Letter of Acceptability from the Department of the Army on August 3, 1960, the contract did not become legally binding until February 23, 1961, when Silberblatt and the Department executed the prime contract after Silberblatt had complied with all of the requirements of the Letter of Acceptability.[6] It held that Silberblatt could not legally subcontract work until the prime contract became legally binding in February, 1961;[7] that Silberblatt did not consider the contract binding with Carter until March of 1961 when it delivered an executed contract to Carter; and that the undisputed facts established that Silberblatt was fully advised by Seaboard on January 11, 1961 that Carter did not present valid bonds, which was before it entered into any sort of binding contractual relationship with Carter. The court noted that at that time Carter had done no work under the contract and that Silberblatt could have protected itself completely by following Seaboard's suggestion to require Carter to provide other suretyship.

There is no contention that Duncan had any actual authority to bind Seaboard, each of the powers of attorney issued to him having been revoked. Power of Attorney No. 4390, issued to him on October 21, 1958, was revoked on December 15, 1958, he was notified thereof, and the Vice President of Seaboard, John F. Schmidt, requested the return of all supplies, seals and equipment. Duncan purportedly complied with this request; however, he evidently withheld at least one copy of Power of Attorney No. 4390 which he attached to the bonds here involved. A second Power of Attorney,

---

6. We do not pass on this question since it is not necessary to a determination of the rights of the parties. As previously mentioned, we have based our affirmance of the trial court's finding of non-liability on the part of Seaboard on other grounds.

7. See n. 6.

No. 4539, was issued to Duncan by Seaboard on October 5, 1959, but it was revoked and terminated on May 9, 1960, and Duncan was notified that Seaboard's supplies would be picked up. When they were picked up, however, one seal was left with Duncan for use in executing a bond that was in the process of being written. Prior to August 30, 1960, Seaboard demanded the return of the seal but Duncan reported it broken and did not return it until January 10, 1961. It is clear from the evidence, however, that this was not the same seal used on the bonds here. (The seal used was a counterfeit. This was visually obvious and also was proven by expert testimony.) On May 11, 1960, a cancellation notice was given by Seaboard of the "card powers of attorney" of Duncan and the members of the firm where he worked as a broker. Card Power of Attorney No. 4390 was cancelled when Seaboard furnished the Department of the Army the card power dated October 5, 1959 (No. 4539) since it revoked all others from the date of its receipt by the Department. On May 17, 1960, notice was given by Seaboard to the Division of Insurance of the State of Missouri cancelling Duncan's license as agent, along with the licenses of the members of the firm where he worked. On July 18, 1960, Seaboard notified the Treasury Department of the United States of the cancellation of the card powers of Duncan and the others.

■ Although it is charged that Duncan had "apparent" authority to bind Seaboard, any authority or agency which he might have possessed would be more correctly termed "agency by estoppel," since, strictly speaking, "apparent" authority must be based on some actual authority.[8] Apparent or ostensible agency and agency by estoppel are referred to interchangeably, however, and in some jurisdictions are treated as being synonymous.

■■ Appellants rely upon the general principles of law as enunciated in Restatement (Second), Agency § 130 (1958), and call to our attention certain cases asserted to be supportive of their argument. It is settled that a company cannot be allowed to .hold out another as its agent and then disavow responsibility for his dealings. Neither can a company place an agent in such a situation that a person of ordinary prudence would be justified in presuming that such agent had authority to perform an act on behalf of his principal without becoming estopped from denying the agent's authority. We agree with these broad general principles of law but they simply do not encompass a factual situation such as exists here. The facts which distinguish the case at bar are not only the fraud of Duncan, his complete lack of actual authority and the fact that no power of attorney was attached to Silberblatt's copy of the bonds, but, more particularly, Seaboard's disclaimer of liability and notice of Duncan's lack of authority to bind Seaboard made directly and in writing to Silberblatt before any loss was incurred.[9]

It is uncontradicted that Seaboard wrote Silberblatt on January 11, 1961 that Duncan had no authority to execute the bonds. Silberblatt did not sign and return the contract to Carter until March 30, 1961; it did not give Carter notice to proceed with the work until the same date; thus, nearly three months transpired between the written notice of invalidity of the bonds and Silberblatt's execution and delivery of Carter's contract and authorization for commencement of the work. Silberblatt obviously

---

8. See *Hall v. Union Indem. Co.*, 61 F.2d 85, 91 (8th Cir. 1932) and 2 C.J.S. Agency §§ 29 and 96 (1936).

9. The trial court stated in its memorandum and order:
 "Familiar principles of apparent authority or other variations of the doctrine of estoppel can not be said to be applicable because Seaboard 'in no way held Duncan out to Seaboard [sic] [Silberblatt] as its agent' nor is there any evidence that would support a finding that Silberblatt relied upon any alleged holding out on the part of Seaboard."

did not consider the contract binding until it was fully executed and delivered to Carter, and during this interim Silberblatt had incurred no loss and had ample time to protect itself.

We have carefully reviewed all of the authorities cited by Silberblatt and are of the view that they do not adequately support its argument. For example, the reference to Restatement (Second) Agency § 130 specifically is applicable to only those "who have *no* notice of the termination of the authority." (Emphasis supplied.) Section 136 of the same volume specifically provides that there is a notification by the principal to the third person of revocation of an agent's authority when the principal states such fact to the third person. None of the authorities cited by Silberblatt is apposite in that none deals with the liability of a principal who has notified the third party (Silberblatt) of the revocation of the agent's authority and the invalidity of the bonds prior to the time the third party has acted to his detriment. Berns & Koppstein, Inc. v. Orion Ins. Co., 170 F.Supp. 707 (S.D.N.Y.1959), held that in order to prove an agency by estoppel it is necessary to establish all of the following elements: (1) that intentional or negligent acts of commission or omission by defendants created the appearance of authority in their alleged agents; (2) that plaintiff acted in good faith and with reasonable prudence in relying upon such appearance of authority; and (3) that plaintiff changed its position to its detriment in reliance upon such appearance of authority; and where these elements are not established there can be no agency by estoppel. Assuming that the first two elements were established, the third was not as Silberblatt had the right to require an acceptable surety at any time and in this instance had full notice of the repudiation of the bond by Seaboard and disclaimer of liability prior to the time that construction on the contract had commenced.

The reason for the rule establishing liability on one of two innocent parties stemming from the misconduct or fraud of a third party upon the one who clothed the third party with the power to commit the fraud is a wholesome one, but here the only innocent party is Seaboard who promptly upon discovery of the fraud notified Silberblatt of the invalidity of the bonds at a time when Silberblatt could have rectified the matter, and this Silberblatt steadfastly refused to do. Although Silberblatt promptly ordered Carter to furnish a valid bond, it soon let Carter know that it had no intention of repudiating the contract. When it became known to Silberblatt that Carter could not or would not produce valid bonds, Silberblatt simply elected to gamble with full knowledge of all the circumstances, and it would be unconscionable for one playing such a role to be permitted to transfer to another any loss later sustained—and that is particularly true where the principal did everything possible by way of notification of termination of Duncan's authority at the time the fraud was discovered. It would unduly extend this opinion to discuss each of the cases cited by Silberblatt, but none of them bears on the factual problem here or is any precedential authority for holding in Silberblatt's favor.

Silberblatt charges that Seaboard was negligent in failing to keep a close count on the number of powers of attorney furnished to Duncan which would have put it in a position to determine whether he had returned those which were not used, but even if Seaboard had known that he did not return one or more it might have been just as helpless to secure their return or prevent their use. It had notified all of the proper authorities of the revocation and was under no duty to give special notice to Silberblatt or Carter since neither had previously done any business with Seaboard through Duncan as agent and it was unaware of his action in issuing the bonds here involved.

■■ Even if a principal leaves an agent clothed with apparent authority, the principal cannot be bound unless the third person knows of such authority and

relies thereon to his detriment. Continental Cas. Co. v. Holmes, 266 F.2d 269, 277 (5th Cir. 1959). And neither can third persons who were unaware that an agency existed and who have not dealt with the agent in reliance on an apparent agency avail themselves of the circumstance that they had no notice of the revocation of the agency, and thus bind the principal. 2 C.J.S. Agency § 77 (1936).[10]

Knowledge merely of the agent's assumed exercise of powers or representations as to his authority is insufficient to bind the principal. All that was attached to Silberblatt's "duplicate original" of the bonds was the certificate of the notary public stating in effect that Duncan was personally known to him as the person who signed the bonds, that he had appeared before him and acknowledged that he voluntarily signed them, and that he stated on oath that he was the attorney-in-fact for Seaboard and that such authority had not been revoked or rescinded. Thus Silberblatt was merely relying upon Duncan's own declarations and representations, which did not bind Seaboard. In Indemnity Ins. Co. of North America v. Lane Contracting Corp., 227 F.Supp 143, 150–151 (D.Neb.1964), Judge Van Pelt, quoting from Rodine v. Iowa Home Mut. Cas. Co., 171 Neb. 263, 106 N.W.2d 391, 397 (1960), said:

> " 'Apparent or ostensible authority or agency for which a principal may be liable must be traceable to him and cannot be established by the acts, declarations, or conduct of the agent. * * * ' "

In the *Lane* case, Judge Van Pelt held that although it is entirely competent to empower another as agent to bind the principal as a surety, those dealing with the agent are put upon inquiry to discover the extent and limits of his power, stating at page 150 of 227 F.Supp. the following:

> "The question of agency is one of fact. There is no presumption of its existence. * * *
>
> "It would seem reasonable that the Bank if tendered a bond signed by an attorney-in-fact would require a copy of the power of attorney whereby it could check on the authority of the agent to bind the surety. In such an important matter as the subrogation or subordination of rights it would seem that good business practice would dictate the same inquiry."

Silberblatt contends that it was excused from making inquiry because it is not the custom or practice in the bonding business for an obligee to verify the authority of an agent to bind the surety, but if the bonds contain no power of attorney for the agent to act and it is subsequently discovered that the agent had no authority to act, as was the case here, it is difficult to see how the principal can be bound. It is noteworthy that material suppliers of Carter made inquiry of Seaboard and this is how the fraud was discovered in the first place.

But even if it could be said that Silberblatt was justified in relying on the authenticity of the bonds because they bore Seaboard's seal and because Carter's attorney stated in his letter of transmittal that he was forwarding "properly executed" bonds, which he was justified in believing them to be, nevertheless, Seaboard had the right to withdraw before the bonds were accepted by Silberblatt. In 72 C.J.S. Principal and Surety § 57 (1951) it is said on page 546:

> "In order that a surety may be bound, it is necessary that the suretyship bond or obligation be duly accepted by the creditor or obligee within a

---

10. The textwriter stated in 2 C.J.S. Agency § 77, page 1167:
 "[B]ut third persons who were unaware that an agency existed and who have not dealt with the agent in reliance on an apparent agency cannot avail themselves of the circumstance that they had no notice of the revocation of the agency, and thus bind the principal."

reasonable time, or, as discussed infra § 60, before the surety has signified an intention to withdraw."

In § 60 at page 547, the textwriter states: "A surety has the right to revoke the suretyship before the instrument is delivered and accepted." In the early case of Paxton v. State, 59 Neb. 460, 81 N.W. 383, 385 (1899), the Nebraska Supreme Court said:

> "Until the sureties were accepted, they were at liberty to recede; but until they signified an intention to recede the state [obligee] might bind them by accepting their offer to answer for the official misconduct of their principal."

To the same effect see 50 Am.Jur. Suretyship § 24 pp. 918, 919.

Whether the bonds were accepted by Silberblatt before notification by Seaboard that Duncan's authority had been revoked and that it repudiated the bonds thus becomes a question of fact. Although Silberblatt had retained the bonds without objection, it had not signified its acceptance, nor had it delivered to Carter a signed copy of the contract which it had promised to do after acceptable bonds were furnished. In Silberblatt's words, it did so on March 30, 1961, "after having received the surety bond."

Finally, "apparent" authority requires that a third person dealing with an agent shall have changed his position to his prejudice or detriment. Only where such person would sustain a loss if the act was not considered that of the principal will it be held to have been within the agent's ostensible powers. The trial court found that at the time Silberblatt was advised by Seaboard on January 11 that Duncan had no authority whatsoever to execute the bonds for the company Carter had done no work under the alleged contract and Silberblatt could have protected itself completely by Seaboard's suggestion to require Carter to provide other suretyship. Silberblatt had not suffered a loss at the time it received notification of the revocation of Duncan's authority and under the facts here Seaboard was not estopped to deny his agency.

*The Silberblatt-Carter Controversy.*

The decisive issue here is whether there was a rescission or abandonment of the subcontract entered into between Silberblatt and Carter dated August 31, 1960. Both Silberblatt and Carter insist before this court that the subcontract remained effective and binding, but despite this assertion of intention of the parties the trial court found from the conduct of the parties that the contract was abandoned and converted into an employer-employee relationship. The court's conclusion was based primarily on a variation from the terms of the contract with regard to the time and manner of advancement of payments from Silberblatt to Carter, said advancements being urgently requested by Carter.

Although the parties were able to agree on a 52-page stipulation supported by numerous documents, the authenticity of which was admitted, they were unable to stipulate the complete factual situation, and a four-day full evidentiary hearing was required.

The court noted that in January, 1962, Carter reached the point where it could not pay its bills and continue to perform and that Silberblatt had the right to terminate the subcontract, take over performance and hold Carter liable for any excess costs of completion, but that Silberblatt waived its rights under the subcontract. Under date of January 24, 1962, Carter wrote Silberblatt stating:

> "Due to pressing financial needs, I wish to request weekly advances against the monthly draw in the amount of my payroll plus payment of such invoices as may be mutually agreed upon. In return for this we will give your firm one third of the profit on this job."

Silberblatt never at any time agreed to such relationship. On February 16, 1962, Carter wrote Silberblatt and re-

quested an advance to pay withholding taxes. In its reply dated February 19, 1962, Silberblatt stated:

"You are informed that all payments made to you from the field are accommodations to assist you in your financial stringency. However, you are not to labor under the impression that you are entitled to such, nor can you make demand upon Mr. Rosvold [Silberblatt's Administrative Officer]."

On April 9, 1962, Silberblatt replied to a letter from Carter's attorney stating "our written contract of August 31, 1960, is the only agreement that exists." In a letter dated July 17, 1962, Carter wrote Silberblatt as follows:

"After careful review of everything that has happened since the execution thereof, we do not believe that you formally accepted this letter of January 24, 1962, or made an agreement of it, either by your actions or by written confirmation thereof to us. It still stands in the nature of an illegal offer, unaccepted by you, which is hereby withdrawn and repudiated for the reasons above stated."

This letter was written by Carter when it was concerned that any such deal as proposed might be in violation of the Federal Anti-Kickback Act. In Silberblatt's reply to that letter it was stated:

"None of the contents of your letter in any way can or does alter your ob-

ligations under your subcontract with us, nor are we, or do we at any time intend to be your partner." [11]

In order to keep the job going, Silberblatt authorized its field office to make weekly advances to Carter by depositing weekly sums to Carter's account in the Rolla State Bank for the payment of labor and material upon Carter's estimates. In Carter's lengthy letter to Silberblatt on July 17, 1962, a portion of which has been previously set out herein, Carter also stated:

"After consulting again with Mr. Becker, we have reached the conclusion that the deposits to our account at the Rolla State Bank from time to time in the future must be in a sum sufficient to meet the requirements of withholding taxes, as well as to include, at least a supervisor's salary for Les Carter, in order to continue with this job to the end. We are without resources to continue further on a 'no pay' basis for him as everything that we have available to us up to now has been invested in this job."

The mechanics of the weekly advances were that Carter would supply Silberblatt's field office with weekly estimates and, based on these, the field office would send the bank a check for deposit to Carter's account. The court found that Les Carter was paid $200.00 per week commencing August 3, 1962. Additionally,

11. The complete letter (omitting its formal parts) is as follows:

"Your registered letter of July 17, 1962 crossed ours to you of the same date; the latter states clearly the status of your account as of that date.

"None of the contents of your letter in any way can or does alter your obligations under your subcontract with us, nor are we, or do we at any time intend to be your partner. In fact, your lengthy dissertation clearly denotes your various failures to maintain your proper responsibilities, while at the same time attempting to shoulder upon us added obligations (properly yours), which we never undertook or intended to undertake when awarding you the work.

"We are conscious of only assisting you and have demonstrated such help by not only making weekly advances, but also by advancing to you in the field on July 20th in excess of $17,000.00 to pay part of your tax indebtedness, after failure on your part to do so precipitated the levy by the Internal Revenue Service and its subsequent seizure of material and equipment which brought your work to a halt. This payment for your tax account was authorized by you at the expense of reducing by an equal amount your indebtedness to your supplier, which in turn exposes us to an added financial risk arising from your operation."

the court found that the original subcontract "was not supplanted by what Carter alleges to be 'a partnership and profit sharing agreement,' * * *." However, the court found that the subcontract was abandoned by the mutual consent of both parties in July of 1962, and finally that neither party breached the subcontract because it "did not legally exist in November, 1962."

We agree with the court's conclusion that the subcontract was not supplanted by the proposed partnership and profit sharing agreement, but we disagree with the court's finding that the contract was abandoned or rescinded by mutual consent of the parties. There is no evidence whatsoever that Silberblatt by any act, statement or writing ever agreed to a rescission or abandonment of the subcontract.

The general law governing our problem is well settled. Rescission of a contract by agreement or abandonment requires an offer and acceptance or, in other words, the mutual consent of the parties. Green Manor Const. Co. v. Highland Painting Service, 345 F.2d 657, 660 (1st Cir. 1965); Phillips Petroleum Co. v. Rau Const. Co., 130 F.2d 499, 502 (8th Cir. 1942); City of Del Rio v. Ulen Contracting Corp., 94 F.2d 701, 704 (5th Cir. 1938); 13 Am.Jur.2d, Building and Construction Contracts § 97, p. 94. An offer to rescind, not accepted by the other party, does not constitute an abandonment by the party making the offer, nor does it constitute a waiver of his right to enforce the contract. City of Del Rio v. Ulen Contracting Corp., *supra*. A rescission of a contract may be in writing or oral (Frommeyer v. L. & R. Const. Co., 261 F.2d 879, 882, 69 A.L.R.2d 1040 (3rd Cir. 1958)), or it need not be expressed by words but may be expressed by actions (Church v. Bobbs-Merrill Co., 272 F.2d 212, 215 (7th Cir. 1959); City of Del Rio v. Ulen Contracting Corp., *supra*; 6 Williston on Contracts § 1826 Rev.Ed.1938); Restatement, Contracts, § 406, comment b (1932)). Ordinarily,

the abandonment of a contract is a question of fact and will not be set aside on appeal unless clearly erroneous. Steele v. McCargo, 260 F.2d 753, 759 (8th Cir. 1958). Where acts and conduct are relied upon to constitute an abandonment or rescission, however, said acts and conduct must be positive and unequivocal. Sanitary Systems, Inc. v. American Surety Co. of New York, 331 F.2d 438 (8th Cir. 1964); Armour & Co. v. Celic, 294 F.2d 432, 436 (2nd Cir. 1961); Sauder v. Dittmar, 118 F.2d 524, 530 (10th Cir. 1941); J. L. Metz Furniture Co. v. Thane Lmbr. Co., 298 F. 91, 92 (8th Cir. 1924); Hoggson Bros. v. First Nat'l Bank, 231 F. 869, 872 (8th Cir. 1916), cert. denied, 241 U.S. 679, 36 S.Ct. 727, 60 L.Ed. 1233 (1916); Miran Investment Co. v. Medical West Building Corp., 414 S.W.2d 297, 303 (Mo. 1967). On the other hand, an innocent party may waive a breach of contract and continue performance on his part. Western Transmission Corp. v. Colorado Mainline, Inc., 376 F.2d 470 (10th Cir. 1967).

In the main, the things which the court considers a breach of contract resulting in an employer-employee relationship are provided for in the subcontract. For example, the subcontract provided that in the event any obligations incurred by Carter in connection with the performance of the subcontract were unpaid, whether due or to become due, Silberblatt was authorized to make such payment direct out of the moneys payable to Carter and could make direct payment to the labor employed by Carter. It provided that Carter's foreman and employees should take orders directly from Silberblatt's superintendent and that Carter would do the work at such times and in such order as Silberblatt might direct. It provided that if at any time there should be any lien or claim for which Silberblatt might be liable and which would be chargeable to Carter, that Silberblatt should have the right to bond or discharge the same and retain out of any payment due or to become due

Carter a sufficient amount to completely indemnify it against such lien or claim. It also provided that progress payments for work performed during any calendar month should be payable within ten days after payment therefor was received by Silberblatt from the Government. It further stated that no payment should be construed as a waiver of any of the provisions of the contract.

 In National Union Fire Ins. Co. of Pittsburgh, Pa. v. D & L Const. Co., 353 F.2d 169, 174 (8th Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 539 (1966), another Capehart Act case, it was held that the fact that the prime contractor made payments to its electrical subcontractor which varied materially from the payment provisions in the subcontract did not discharge the subcontractor's surety in whole or in part. By the same token, the weekly payments instead of the monthly progress payments made by agreement of the parties would not be such a variance of the contract as would render it invalid as between the parties or constitute an abandonment. The subcontract permitted such things as direct payment to suppliers and laborers, as well as payment of certain liens against the subcontractor.

About the only thing that could be mentioned as being in any way indicative that the subcontract had been abandoned was the fact that in the last stages Silberblatt's daily log made no mention of Carter as a subcontractor, but Mr. Rosvold's explanation for this was that when Carter quit operating his office there he failed to file daily reports with Silberblatt, and that with no daily report from him Silberblatt had no summation to give. At any rate, this act of omission by Silberblatt was overcome by its numerous express reaffirmances of the subcontract.

 It is within the competence of appellate courts as an issue of law to review the interpretation given a written contract. Wooddale, Inc. v. Fidelity & Deposit Co. of Maryland, 378 F.2d 627, 631 (8th Cir. 1967); Standard Title Ins. Co. v. United Pac. Ins. Co., 364 F.2d 287, 289 (8th Cir. 1966). Although a party to a contract may by express agreement or by his own course of conduct waive his legal right to insist on strict performance of the covenants of the contract and the question whether such facts exist in any given case is a question of fact for the trier of facts, nevertheless the question as to what facts are sufficient to constitute a waiver is a question of law. Stewart v. Meyers, 353 F.2d 691, 694 (7th Cir. 1965); Chicago Sugar Co. v. American Sugar Refining Co., 176 F.2d 1 (7th Cir. 1949).

 Since in our canvass of the record, including the testimony of the parties and their witnesses, numerous correspondence and other exhibits, we find a complete absence of any evidence that Silberblatt by any statement, writing or act at any time consented to a rescission or abandonment of the subcontract, but on the contrary constantly persisted in the assertion that the same was valid and legally binding on the parties, the record leaves us with no choice but to hold that the subcontract continued in existence and that the contrary findings and conclusions of the trial court are clearly erroneous. Under Fed.R. Civ.P. 52(a), a finding of fact by the trial court is clearly erroneous if it is induced by an erroneous view of the law or if substantial evidentiary support is lacking. Even though there is evidence to support a finding of fact, it is clearly erroneous if the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Herges v. Western Cas. & Sur. Co., 408 F.2d 1157, 1163 (8th Cir. 1969); First Nat'l Bank of Clinton v. Julian, 383 F.2d 329, 333 (8th Cir. 1967).

We affirm the trial court in absolving Seaboard from any liability but otherwise remand the case to the district court for its determination of liability and damages, if any, consistent with our holding that the subcontract continued in existence.