# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

No. 00-6059 MN

_____

In re: Innovative Software Designs, Inc.,    *

Debtor.    *

_____    *

   *

Keith E. Kimmons,    *      Appeal from the United States

     Claimant-Appellant.    *      Bankruptcy Court for the

   *      District of Minnesota

v.    *

   *

Innovative Software Designs, Inc.,    *

     Debtor-Appellee.    *

_____

Submitted: September 1, 2000
Filed: September 20, 2000

_____

Before WILLIAM A. HILL, SCHERMER, and SCOTT, Bankruptcy Judges.

_____

WILLIAM A. HILL, Bankruptcy Judge.

       Keith E. Kimmons appeals from the bankruptcy court's[1] order disallowing his proof of interest in the Debtor, Innovative Software Designs, Inc. We have jurisdiction over this appeal from the final order of the bankruptcy court. See 28 U.S.C. § 158(b). For the reasons set forth below, we affirm.

---

[1]The Honorable Nancy C. Dreher, United States Bankruptcy Judge for the District of Minnesota.

BACKGROUND

Henry F. Camacho Jr. incorporated the Debtor, Innovative Software Designs, Inc. ("ISD") in Minnesota on June 5, 1990, as a sideline software design business. In 1992, Camacho met Keith E. Kimmons at Businessland, a company where they were both employed.

In 1994, Camacho joined Kimmons and another partner, James Bombardo, to form a new business known as Network Management Services and Systems, Inc. ("NMS"). At the time NMS was formed, Kimmons, Camacho, and Bombardo orally agreed to share equal ownership of NMS. Bombardo incorporated NMS on April 25, 1994. Through NMS, the partners ran several computer-related businesses. Camacho and ISD focused on designing software; Bombardo and Excess, Inc.[2] ("Excess") focused on selling and repairing hardware; and Kimmons focused on consulting work. The partners did not deal with ISD and Excess as separate entities. However, there was no formal contract or documentation setting forth the structure of NMS, especially with respect to ownership of ISD and Excess.

In the fall of 1994, Bombardo remarked to Camacho and Kimmons his belief that as the sole incorporator of NMS, he owned all of NMS. This sparked a discussion between the partners that resulted in the following statement being signed by Camacho, Kimmons, and Bombardo on September 16, 1994:

> This document states that Network Management Services and Systems Inc., Excess Inc., and Innovative Software Designs Inc. are equally owned by the following persons:
>
> James Bombardo
> Henry F. Camacho Jr.
> Keith E. Kimmons

Significantly, Kimmons never paid for any stock in ISD and never received any stock certificates. Similarly, there is no evidence that ISD ever issued any stock to Kimmons. In fact, there are no other documents or corporate resolutions from any of the three subject corporations implementing the alleged equal ownership agreement between Kimmons, Camacho, and Bombardo.

In late 1994, Bombardo expressed a desire to leave the partnership and take Excess with him. Kimmons, Camacho, and Bombardo then signed an agreement to implement Bombardo's desire on

---

[2]Excess, Inc. was not formally incorporated until January of 1995.

December 20, 1994. Bombardo agreed to sell his interests in ISD and NMS to Kimmons and Camacho. Kimmons and Camacho, in turn, agreed to sell their interests in Excess to Bombardo. As a result, only Kimmons and Camacho were left inside the original partnership, each supposedly owning fifty percent of ISD and NMS.

Meanwhile, Kimmons owed the IRS over $42,000 in unpaid taxes, and the IRS was pursuing collection efforts against him. As a result, Kimmons entered a repayment agreement with the IRS in which he stated that he had no stocks, bonds, or investments, thereby failing to disclose any ownership of ISD stock. Kimmons' 1994 tax return lists NMS as his sole proprietorship and does not indicate that Kimmons owned any stock in ISD.[3]

In late 1994, Kimmons was experiencing marital problems, and his wife filed for divorce. On a sworn statement of income, assets, and liabilities associated with his divorce proceeding, Kimmons claimed no interest or stock ownership in ISD. Kimmons signed this sworn statement approximately two months after he, Camacho, and Bombardo signed the September 14, 1994, statement of mutual ownership regarding NMS, ISD, and Excess. Kimmons' marriage was dissolved on December 12, 1994.

In late 1994 or early 1995, Kimmons left the partnership to take a job with Blue Cross and Blue Shield of Minnesota. NMS, which had been the key corporation through which the partners had been operating, ceased doing business and was eventually dissolved by the Secretary of State on September 25, 1998, due to the failure to file annual registration papers.
After Kimmons went to work for Blue Cross, Camacho began developing ISD as an internet provider. To raise money, Camacho asked Kimmons to invest in ISD. However, Kimmons declined, stating that he no longer wanted anything to do with ISD. Camacho then applied for a loan from the Small Business Administration. On the loan application, Camacho listed himself as the sole shareholder of ISD and provided the only personal guarantee. In addition, ISD's corporate tax returns from 1994 through 1998 list Camacho as ISD's sole shareholder.

In 1997, Blue Cross initiated a criminal investigation against Kimmons, alleging that Kimmons had submitted fraudulent invoices on behalf of ISD and another corporation for payment by Blue Cross. Kimmons was fired by Blue Cross, and criminal charges were filed against Kimmons which are still

---

[3]Kimmons' 1998 tax return also fails to indicate any ownership interest in ISD.

pending. In December of 1997, Kimmons commenced a state court action against Camacho and ISD, asserting an ownership interest in ISD and seeking dissolution of the company. This lawsuit was quickly abandoned because Kimmons could not afford to pay an attorney. The abandoned lawsuit constituted the first time since late 1994 or early 1995 that Kimmons claimed an ownership interest in ISD.

On March 16, 1999, ISD filed a chapter 11 bankruptcy petition. Kimmons did not appear on ISD's petition and schedules as either a creditor or an owner of ISD stock. Kimmons nevertheless learned of ISD's bankruptcy filing during a conversation with Bombardo in late June, 1999. Kimmons then filed a proof of claim asserting that he owned fifty percent of ISD and that ISD owed him $150,000 for two years of unpaid salary. ISD objected to Kimmons' proof of claim and an evidentiary hearing was held on December 13 and 14, 1999. After the hearing, the bankruptcy court ruled that it was improper to resolve the issue of Kimmons' ownership interest in ISD because the bankruptcy court had not yet ordered the filing of proofs of interest. In addition, the bankruptcy court disallowed Kimmons' proof of claim for $150,000 in unpaid salary, ruling that ISD had introduced sufficient evidence to rebut the proof of claim and that Kimmons had subsequently failed to carry his burden of proof as to the claim's validity.

Subsequently, Kimmons moved the bankruptcy court for an order allowing him to file a proof of interest, and the motion was granted. Kimmons then filed a proof of interest in ISD, asserting that he owned fifty percent of ISD based largely on the alleged mutual ownership agreement between the parties, as evidenced by the signed statement of September 14, 1994. ISD objected to Kimmons' proof of interest, and the parties agreed to submit the issue to the bankruptcy court largely on the basis of the evidence and exhibits introduced at the prior evidentiary hearing of December 13 and 14, 1999. By the order dated May 15, 2000, the bankruptcy court found that ISD had produced sufficient evidence to rebut Kimmons' proof of interest, thereby shifting the burden of proof back to Kimmons. The bankruptcy court then found that Kimmons had not sufficiently proven the validity of his proof of interest. Specifically, the bankruptcy court ruled that even if there had been an enforceable mutual ownership agreement, it had been abandoned by the parties several years earlier. The bankruptcy court then sustained ISD's objection and disallowed Kimmons' proof of interest.

Kimmons appeals from the bankruptcy court's order disallowing his proof of interest, arguing that the bankruptcy court clearly erred in finding that the parties had abandoned their mutual ownership agreement several years before ISD filed its bankruptcy petition. In addition, Kimmons argues that he owns stock in ISD that he has not abandoned.

4

## STANDARD OF REVIEW

On appeal, we review the bankruptcy court's findings of fact for clear error and its conclusions of law *de novo*. Fed. R. Bankr. P. 8013; Hatcher v. U. S. Trustee (In re Hatcher), 218 B.R. 441, 445 (B.A.P. 8th Cir. 1998) (citations omitted); Gourley v. Usery (In re Usery), 123 F.3d 1089, 1093 (8th Cir. 1997); O'Neal v. Southwest Mo. Bank (In re Broadview Lumber Co.), 118 F.3d 1246, 1250 (8th Cir. 1997). A fact finding is clearly erroneous when the reviewing court, based on the entire evidence, is left with a definite and firm conviction that a mistake has been committed. Hatcher, 218 B.R. at 445-46 (citations omitted).

## DISCUSSION

An equity security holder may file a proof of interest. 11 U.S.C. § 501(a). "A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). Since a properly filed proof of claim, which includes supporting documents, is entitled to *prima facie* evidentiary effect, a proof of interest which similarly includes supporting documentation should also be given *prima facie* evidentiary effect. See Fed. R. Bankr. P. 3001(a), (f); Official Bankruptcy Form 10: Proof of Claim; 4 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 502.02[1], at 502-10 (15th ed. rev. 2000) ("[U]nder section 502(a), a proof of claim or proof of interest which was properly filed pursuant to section 501(a) constitutes *prima facie* evidence . . ."). Thus, if an objection is filed, the "objecting party must then produce evidence rebutting" the proof of interest or it will be allowed. See Gran v. Internal Revenue Service (In re Gran), 964 F.2d 822, 827 (8th Cir. 1992) (citing California State Board of Equalization v. Official Unsecured Creditors' Committee (In re Fidelity Holding Co.), 837 F.2d 696, 698 (5th Cir. 1988)). "If, however, evidence rebutting the [proof of interest] is brought forth, then the claimant must produce additional evidence to prove the validity of the [claimed interest] by a preponderance of the evidence." Id. (internal quotation marks omitted; citation omitted).

### A. Abandonment of Contract

Kimmons argues that the bankruptcy court clearly erred in finding that the parties abandoned their alleged mutual ownership agreement regarding NMS and ISD. "Ordinarily, the abandonment of a contract is a question of fact and will not be set aside on appeal unless clearly erroneous." S. S. Silberblatt, Inc. v. Seaboard Surety Co., 417 F.2d 1043, 1054 (8th Cir. 1969) (citing Steele v. McCargo, 260 F.2d 753, 759 (8th Cir. 1958)). A party seeking to prove abandonment of a contract must present clear and convincing evidence of an intention by the other party to abandon its rights. Republic Nat'l Life Ins. Co. v. Marquette Bank & Trust Co. of Rochester, 295 N.W.2d 89, 93 (Minn. 1980). Intent to abandon may

5

be ascertained from facts and circumstances surrounding the transaction and may be implied from acts of the parties. Id.; Buresh v. Mullen, 207 N.W.2d 279, 281 (Minn. 1973); Ahlstrand v. McPherson, 173 N.W.2d 330, 333 (Minn. 1969). Conduct of the parties that is positive, unequivocal, and inconsistent with the existence of a contract is sufficient to support a mutual abandonment of contract. Desnick v. Mast, 249 N.W.2d 878, 884 (Minn. 1980); Country Club Oil Co. v. Lee, 58 N.W.2d 247, 251 (Minn. 1953). Where acts of one party inconsistent with existence of a contract are acquiesced in by the other party to the contract, the contract will be treated as abandoned. Lee, 58 N.W.2d at 251.

Assuming that there was in fact an enforceable agreement between the parties as to equal ownership of the subject corporations,[4] there is sufficient evidence to support the bankruptcy court's finding that the agreement had been abandoned. As we discuss more fully below, the parties never implemented the alleged equal ownership agreement by exchanging stock in the subject corporations. Moreover, by late 1994, the partners began to go their separate ways. Bombardo left NMS, taking Excess with him. Kimmons left NMS for a job at Blue Cross and Blue Shield of Minnesota. NMS, the key enterprise through which all the partners had been conducting business, ceased to operate and was eventually dissolved by the Secretary of State. In addition, there is sufficient evidence to support the inference that both Kimmons and Camacho believed the mutual ownership agreement was no longer in effect. Kimmons did not claim to own any stock in ISD when asked to disclose such interests in both his IRS repayment agreement and in the course of his divorce proceeding. Furthermore, Kimmons listed NMS as his sole proprietorship on his 1994 income tax return, thereby indicating that Camacho had no ownership in NMS. Similarly, ISD's corporate tax returns from 1994 through 1998 list Camacho as the sole shareholder and 100 percent owner of ISD. In applying for a loan from the Small Business Administration on behalf of ISD, Camacho gave the only personal guarantee and again listed himself as the sole shareholder and owner of ISD. These actions by both parties are clearly inconsistent with any agreement that they would continue to share equal ownership of NMS and ISD.

Finally, the bankruptcy court refused to credit Kimmons' testimony that he always thought of himself as an owner of ISD and that he had always remained involved in ISD's operations behind the scenes. The bankruptcy court specifically stated that Kimmons was badly impeached several times and that his testimony simply was not credible. Determinations as to the credibility of witnesses are uniquely

---

[4]The bankruptcy court made no express ruling as to the enforceability of this alleged agreement, and neither do we.

within the province of the trier of fact.  Estate of Davis by Ostenfeld v. Delo, 115 F.3d 1388, 1394 (8th Cir. 1997) (citing Anderson v. City of Bessemer, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). Accordingly, we must give deference to the bankruptcy court's determination as to Kimmons' credibility. Based on the entire evidence, we are not left with a definite and firm conviction that a mistake has been committed, and we affirm the bankruptcy court's finding that any mutual ownership agreement between Kimmons and Camacho regarding NMS and ISD had been abandoned by late 1994 or early 1995.

### B.  Abandonment of ISD Stock

Kimmons also argues that he did not abandon or transfer any of his stock in ISD.[5]  However, the record does not indicate that Kimmons ever acquired any shares of ISD stock in the first place.  Shares of stock may be acquired by issuance or transfer.  A Minnesota corporation may issue securities only when authorized by the board of directors.  Minn. Stat. § 302A.401, subd. 1.  Transfer of a security requires delivery with intent to change ownership.  DLH, Inc. v. Russ, 566 N.W.2d 60, 72 (Minn. 1997).  A certificated security is represented by a certificate, and delivery occurs when the purchaser acquires possession of the certificate.  See Minn. Stat. § 336.8-102(a)(4); Minn. Stat. § 336.8-301(a)(1). An uncertificated security is not represented by a certificate.  Minn. Stat. § 336.8-102(a)(18).  Only a corporate resolution by the board of directors may establish that some or all of a corporation's shares of stock will be uncertificated.  Minn. Stat. § 302A.417, subd. 7.  Delivery of an uncertificated security occurs when the issuer registers the purchaser as the registered owner.  Minn. Stat. § 336.8-301(b)(1).

In this case, there is no evidence that any shares of ISD stock were ever issued to Kimmons. Specifically, there is no evidence that any corporate resolution was ever passed involving the issuance of ISD stock to Kimmons; nor is there any corporate documentation of any kind indicating that shares of ISD stock had been issued to Kimmons.  Clearly, Kimmons did not acquire any shares of ISD stock by direct issuance from ISD.

Similarly, there is no evidence that Kimmons acquired any ISD stock by transfer.  Kimmons

---

[5]Kimmons' argument on this point is based, in part, on Minnesota's Uniform Disposition of Unclaimed Property Act.  See Minn. Stat. §§ 345.31–345.60.  Since this statutory argument was not raised before the bankruptcy court, we will not consider it for the first time on appeal.  See Norwest Bank of North Dakota, N. A. v. Doth, 159 F.3d 328, 334 (8th Cir. 1998).  Moreover, our ruling on this point has little bearing on the outcome of the case given the lack of evidence that Kimmons ever acquired ISD stock to begin with.

acknowledges that he never received any ISD stock certificates. Nevertheless, he argues that uncertificated shares of ISD stock were transferred to him by operation of the September 14, 1994, statement of mutual ownership signed by the partners. However, the statement Kimmons relies on does not purport to create uncertificated shares of ISD stock; nor does it purport to register any uncertificated shares in Kimmons' name. It merely reflects the partners' assumption, albeit a false one, that they enjoyed equal ownership of the subject corporations even though no shares of stock had ever changed hands. Since there are no other documents, corporate or otherwise, establishing uncertificated shares of ISD stock or registering Kimmons as the owner of such shares, there is no evidence that Kimmons received delivery of any uncertificated shares of ISD stock. Thus, no valid transfer of any such shares to Kimmons has been established. Accordingly, Kimmons never had any stock to abandon, and his argument must fail.

## CONCLUSION

Based on the foregoing, we affirm the bankruptcy court's decision sustaining ISD's objection and disallowing Kimmons' proof of interest.

A true copy.

Attest:

CLERK, U.S. BANKRUPTCY APPELLATE PANEL,
EIGHTH CIRCUIT.